# United States Court of Appeals
## For the First Circuit

---

No. 21-1177

ROBERT R. CUSHING, individually and in his capacity as the Minority Leader of the N.H. House of Representatives; DAVID COTE; KATHERINE D. ROGERS; KENDALL SNOW; PAUL BERCH; DIANE LANGLEY; CHARLOTTE DILORENZO; N.H. DEMOCRATIC PARTY,

Plaintiffs, Appellants,

v.

SHERMAN PACKARD, in his official capacity as Speaker of the House for the N.H. House of Representatives,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

---

Before

Howard, Chief Judge,
Lynch, Thompson, Kayatta, and Barron, Circuit Judges.

---

Israel Piedra, with whom Welts, White & Fontaine, PC, William E. Christie, S. Amy Spencer, and Shaheen & Gordon, P.A. were on brief, for appellants.

Anthony J. Galdieri, Senior Assistant Attorney General for the State of New Hampshire, with whom Samuel R. V. Garland, Assistant Attorney General for the State of New Hampshire, and Jennifer S. Ramsey, Assistant Attorney General for the State of New Hampshire, were on brief, for appellee.

Katherine E. Lamm, Attorney, Civil Rights Division, United States Department of Justice, with whom Kristen Clarke, Assistant Attorney General, and Thomas E. Chandler, Attorney, Civil Rights

Division, United States Department of Justice, were on brief, for the United States, amicus curiae.

Joshua L. Gordon was on brief for ABLE - New Hampshire and National Disability Rights Network, amici curiae.

Opinion En Banc

March 25, 2022

**BARRON, Circuit Judge, with whom Howard, Chief Judge, and Lynch, Circuit Judge, join.** Does either Title II of the Americans with Disabilities Act ("ADA") or § 504 of the Rehabilitation Act ("RHA") authorize a federal court to resolve a dispute among members of a state legislative body about whether votes on bills may be cast remotely rather than in person? That question and others closely related to it arise here from a dispute among members of the New Hampshire House of Representatives ("House") over the proper way for that legislative body to conduct its official proceedings in the face of the threat to health that the COVID-19 virus poses.

Procedurally speaking, the questions come to us in connection with an interlocutory appeal by members of the House, each of whom is alleged to be especially vulnerable to the virus due to a medical condition, and the New Hampshire Democratic Party. The appeal challenges the denial by the United States District Court for the District of New Hampshire of a motion for a preliminary injunction against Sherman Packard, the Speaker of the House. The motion seeks to require the Speaker to institute procedures that would permit the representatives to participate remotely in House proceedings -- including with respect to the casting of votes on bills -- to reduce their risk of being infected with the virus.

The underlying suit names the Speaker, in his official capacity, as the defendant and alleges his violation of both Title II of the ADA and § 504 of the RHA, among other provisions of federal and state law, based on his refusal to grant the representatives' request for that same accommodation. The motion for a preliminary injunction was based on the plaintiffs' ADA- and RHA-related claims.

The District Court denied the motion based on the Speaker's assertion of legislative immunity. See Cushing v. Packard, No. 21-cv-147, 2021 WL 681638 (D.N.H. Feb. 22, 2021). On interlocutory appeal, a panel of our Court unanimously vacated and remanded the District Court's ruling on the ground that Title II of the ADA abrogated, and § 504 of the RHA in this case effected a waiver of, legislative immunity, such that the plaintiffs' claims based on those statutes could be considered on their merits. Cushing v. Packard, 994 F.3d 51 (1st Cir. 2021).

The Speaker at that point petitioned our Court for rehearing en banc, which we granted in an order that vacated the panel's decision. Cushing v. Packard, No. 21-1177, 2021 WL 2216970 (1st Cir. June 1, 2021); see 1st Cir. I.O.P. X(D). Thus, we now must review anew the District Court's denial of the motion for the preliminary injunction.

We are mindful of the seriousness of the threat to public health that the COVID-19 virus poses. Indeed, we have held our proceedings in this case remotely in accord with our own protocols for dealing with that threat. But, our task in this appeal is not to determine the most advisable means of conducting governmental operations during the pandemic. Nor is it to decide how the ADA's and the RHA's requirements to provide reasonable accommodations to those with medical vulnerabilities apply in the face of the peculiar risk that this specific virus presents. It is solely to determine whether the District Court erred in holding that the Speaker's assertion of legislative immunity prevents the plaintiffs from obtaining the preliminary injunctive relief that they seek. Because we conclude that the District Court did not err in so holding, we affirm the denial of the motion for the preliminary injunction and remand the case for further proceedings consistent with this ruling.

**I.**

**A.**

On March 13, 2020, New Hampshire Governor Christopher T. Sununu issued an executive order that declared a state of emergency due to the COVID-19 virus's spread. N.H. Exec. Order 2020-04 (Mar. 13, 2020) ("Order"). The Order, among other things, encouraged State government bodies to "conduct meetings through electronic

means while preserving, to the extent feasible, the public's right to notice of such meetings and ability to observe and listen contemporaneously." Id. at 4, ¶ 8.

The Order did not direct the House to take any specific action. Indeed, the New Hampshire Constitution commits to the members of the House the power to "choose their own speaker, appoint their own officers, and settle the rules of proceedings in their own house." N.H. Const. pt. II, art. 22.

But, in the immediate wake of the Order, the House, which with 400 members is the largest single state legislative body in the country, chose of its own accord to suspend all its proceedings before then resuming them in June. The House did not hold the resumed proceedings in the House chamber. Instead, the House held proceedings twice in June and once in September at the Whittemore Center, the University of New Hampshire's ice hockey arena, to facilitate social distancing and thereby reduce the risk that those participating in the proceedings would be infected with the virus.

The House also began to consider conducting its future proceedings remotely. As part of that consideration, it sought an advisory opinion on September 16, 2020 from the New Hampshire Supreme Court as to whether "holding a session of the New Hampshire House of Representatives remotely, either wholly or in part,

whereby a quorum could be determined electronically, violates Part II, Article 20 of the New Hampshire Constitution."[1]

The House did not thereafter hold any proceedings during the remainder of the legislative session. But, before the legislative session ended, the New Hampshire Supreme Court, on November 17, 2020, issued an opinion in response to the House's request.

The opinion advised the House that holding legislative proceedings remotely would not prevent the House from discerning a quorum. See Opinion of the Justices, 247 A.3d 831, 840 (N.H. 2020) (discussing N.H. Const. pt. II, art. 20). The opinion further explained that, as a result, the New Hampshire Constitution did not prohibit remote participation by representatives in House proceedings. See id.

**B.**

The New Hampshire Supreme Court issued its advisory opinion soon after elections had been held in the state for seats to the House for the upcoming legislative session. Those elections

---

[1] Part II, Article 20 of the New Hampshire Constitution provides that "[a] majority of the members of the House of Representatives shall be a quorum for doing business: But when less than two thirds of the Representatives elected shall be present, the assent of two thirds of those members shall be necessary to render their acts and proceedings valid."

ushered in the next phase of the House's debate over how to conduct its proceedings during the pandemic.

Under Part II, Article 3 of the New Hampshire Constitution, the House for the preceding legislative session is dissolved at 12:01 A.M. on the first Wednesday of December in even-numbered years. That portion of the New Hampshire Constitution further provides that the House for the subsequent legislative session is constituted on that same day.

That day is recognized by the House as "Organization Day," and on it the Governor swears in all members of the House. The House on that day also establishes rules for its upcoming legislative session.

Organization Day in 2020 fell on December 2, and the proceedings of the House on that date took place outdoors, next to the Whittemore Center. Because the November elections had resulted in a shift of party control in the House from the Democrats to the Republicans, the House elected a new Speaker, Representative Richard "Dick" Hinch, during the Organization Day proceedings. The House also adopted, during those same proceedings, rules to govern the upcoming legislative session.

As part of the debate over those rules, newly elected Representative Andrew Bouldin proposed to require the Speaker to accommodate members who wished to participate remotely in

proceedings of the House and to cast votes on legislation by that same means. Representative Sherman Packard spoke against the proposal as being premature. The House rejected Rep. Bouldin's proposed rule to require such an accommodation by a vote of 182 to 56. See N.H. House Journal, Vol. 43, No. 1, at 7.

Then, on December 9, 2020, Speaker Hinch died of complications related to COVID-19. Representative Packard, who was named Deputy Speaker of the House shortly after Speaker Hinch's election on December 2, became the Acting Speaker of the House. The Acting Speaker announced that, in accord with Part II, Article 3 of the New Hampshire Constitution, the next proceedings of the House would take place on January 6, 2021. He also announced that the proceedings would be held in a parking lot on the University of New Hampshire's campus.

In response to the announcement, a number of House members, including plaintiffs in this case, sent emails to the Acting Speaker in which they requested that he provide them with an accommodation, on account of their medical conditions and other limitations, to participate in the January 6 proceedings remotely. The Acting Speaker rejected the requests. He indicated, however,

that he would make unspecified accommodations based on medical needs for members who did attend the proceedings in person.[2]

At the proceedings held on January 6, 2021, the House elected Acting Speaker Packard as Speaker. In addition, Majority Leader Jason Osborne and Minority Leader Robert R. Cushing

[2] For example, one plaintiff, Representative David Cote, emailed the following message to Acting Speaker Packard on December 24, 2020: "I appreciate yesterday's conversation with you, but given the fact that you indicated there would be no remote option for the 6th, and given my prior coronary artery disease, diagnosed following a heart attack and the implementation of four stents in 2018, as well as the fact that my attending would require me to carpool with at least one other person with no social distancing being possible, I cannot see how in the absence of a remote option I can safely participate in the session of January 6." He added: "I am utterly mystified as to why we can't proceed under a hybrid option thus allowing each representative to make individual choices based on their individual health and family situation." On December 27, 2020, Aaron Goulette, an aide for Speaker Packard, responded as follows: "Acting Speaker Packard asked me to let you know that if you chose to attend the proposed drive-in session in Durham on January 6th, we will make sure you are accommodated. If you do plan to attend, let us know, and we can create a plan for your attendance." Representative Cote then responded to Goulette by email the next day: "Thank you to both yourself and the Acting Speaker for the courtesy of a reply. As I hoped I had made clear previously, my attendance on January 6 is not a question of my choice, but rather a question of the availability of a remote attendance option, which would enable me to attend without risk of exposure to COVID 19, given my age, existing health challenges, and lack of driving capability, to which I have referred previously. I continue to be mystified as to why a remote option accommodation is not made available. The Acting Speaker explicitly stated to me that there would be no remote option on January 6." He added: "I have the greatest respect for my constituents, but I cannot imagine that they would expect me to risk my life to represent them. To give me or any member similarly situated such a Hobson's choice is to my mind utterly unsatisfactory."

introduced a proposed amendment to the House Rule governing the House's procedures for conducting legislative business.

That rule establishes an order of precedence in the event that the House's adopted rules are silent on a given procedural matter, such that the authorities in the designated order of precedence are treated as the House Rules. The order of precedence under the House rule prior to its amendment was "Constitutional provisions"; the House Rules; "[c]ustom, usage, and precedent"; the House's adopted parliamentary manual, which was the 2010 edition of Mason's Manual of Legislative Procedure; and relevant statutory provisions. The amendment, approved by the House in a 316 to 4 vote, reflects just one change: the House's adoption of the 2020 edition of Mason's Manual as its parliamentary manual, substituting it for the 2010 edition. See N.H. House Journal, Vol. 43, No. 2, at 4-5.

The 2020 edition of Mason's Manual is the only one of the authorities in the order of precedence that speaks to whether remote participation in legislative proceedings can take place. The 2020 edition of the manual provides, in relevant part: "Absent specific authorization by the constitution or adopted rules of the body, remote participation in floor sessions by members of the legislative body is prohibited." Mason's Manual of Legislative Procedure, § 786 (2020). The 2010 edition, according to the

parties, was silent on whether remote participation in floor proceedings was allowed.

A proposal was introduced at the House proceedings to amend the House rules to permit virtual proceedings of the full House.[3] The House rejected the proposed rule by a vote of 187 to 149. N.H. House Journal Vol. 43, No. 2, at 8 (Jan. 6, 2021); see Holly Ramer, American Idle: New Hampshire House Holds Drive-In Session, Associated Press (Jan. 6, 2021).[4]

---

[3] The Clerk's Note on the January 6, 2021 legislative session reads in part:

> On the session day of January 6, the House utilized a voting device system whereby members entered their votes via keypad and were recorded utilizing a radio-frequency-based receiver. Unfortunately, through circumstances beyond the control of staff and the system, some votes were not captured for a variety of reasons, including interference from other electronic devices, vehicles acting as Faraday shields, and the like. Following the session, members notified the Clerk of missed votes and their preferences are entered in this Journal at the conclusion of recorded votes.

N.H. House Journal Vol. 43, No. 2, at 4.

[4] We note that the New Hampshire Senate held its proceedings on January 6, 2021 remotely. In doing so, the Senate had relied on the authority of Governor Sununu's Executive Order encouraging the State's government bodies to "conduct meetings through electronic means." N.H. Exec. Order 2020-04, at 4, ¶ 8; see N.H. Senate Journal No. 2, at 25 (Jan. 6, 2021).

**C.**

On January 29, 2021, Cushing, in his role as Minority Leader of the House, sent a letter to the Speaker in which he requested reasonable accommodations that would allow House members with a medical condition that made them especially vulnerable to the virus to attend House proceedings remotely. The Speaker held a meeting with Cushing days later to discuss concerns related to the next legislative session, scheduled to take place on February 24, 2021.

On February 8, 2021, Cushing sent another letter to the Speaker in which Cushing again requested reasonable accommodations for himself and other legislators that would permit their remote participation in House proceedings. The Speaker replied on February 12, 2021, thanking Cushing for his "continued dialogue on remote session participation," and asserting that his office "continue[s] to research if a reasonable remote solution exists that will meet the unique logistical and security requirements of our 400 member House of Representatives," as "[a] solution that would meet our unique needs has not yet been identified."

On that same day, Representative Charlotte DiLorenzo sent a letter to Jennifer Becker, the ADA Representative for the

New Hampshire General Court.[5] In that letter, she sought a reasonable accommodation in the form of being "allowed to attend House Session and House Committee Hearings virtually via Zoom or a similar platform." DiLorenzo stated that her medical condition made her "vulnerable to contracting the [COVID-19] virus and jeopardize[d her] ability to fulfill [her] duty as a State Representative, to the best of [her] ability and according to the New Hampshire Constitution."

**D.**

On February 15, 2021, Cushing, DiLorenzo, five other members of the House, and the New Hampshire Democratic Party filed this suit in the District of New Hampshire, against Speaker Packard "in his official capacity only."[6] No other defendant was named.

The complaint alleges, among other things, that the Speaker is in violation of Title II of the ADA and § 504 of the RHA by failing to grant a reasonable accommodation that would permit the House members bringing the suit to participate remotely

---

[5] The New Hampshire General Court is the formal name of the state's bicameral legislative branch, of which the House of Representatives is one part.

[6] The Court understands that Robert R. Cushing passed away during the pendency of this appeal. No party has submitted any filings concerning the effect, if any, of his untimely death.

in the proceedings of the House.[7] In support of those claims, the complaint alleges that the representatives bringing the suit are eligible to participate fully in the activities of the House by virtue of their election to it and that they are qualified individuals with a disability. They further allege that the Speaker's failure to provide their requested accommodation "denies [the plaintiffs] basic health and safety protection . . . and has a disparate impact on [the plaintiffs], whose disabilit[ies] place them at greater risk than the general public for serious complications or death from COVID-19." The suit seeks, in addition to declaratory relief, an order that would enjoin the Speaker to allow the House members bringing the suit to participate remotely in legislative proceedings, including with respect to the casting of votes on bills.

The plaintiffs then filed an emergency motion for a preliminary injunction "and/or" temporary restraining order to secure the same relief based on the ADA- and RHA-related claims. The Speaker filed a motion in opposition -- without also moving to

[7] Throughout the opinion, we refer to the plaintiffs' request as a request for a reasonable accommodation, but we note that we adopt the language of the RHA in doing so. See 29 U.S.C. § 701. The ADA refers to such requests as a request for a "reasonable modification." See 42 U.S.C. § 12131(2). "[T]here is no material difference between the terms." Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 145 n.6 (1st Cir. 2014).

dismiss -- on the ground that the plaintiffs could not show a likelihood of success on the merits, in part due to the legislative immunity enjoyed by the Speaker.

The District Court held a four-hour hearing on the motion, at which it considered declarations and affidavits submitted by the defendants. The District Court then issued an opinion denying the motion on the ground that due to legislative immunity the plaintiffs had failed to show a substantial likelihood of success on the merits as to the claims at issue, notwithstanding the plaintiffs' contention that the Speaker was not entitled to legislative immunity with respect to their ADA and RHA claims even if that immunity would bar other of their claims. See Cushing, 2021 WL 681638, at *6-7.

The plaintiffs then sought expedited appellate review of the District Court's denial of its motion for a preliminary injunction. A panel of this Court issued a judgment vacating the District Court's order denying the motion and remanding the case for further proceedings consistent with its ruling, on the ground that the ADA abrogated and the RHA effected a waiver of legislative immunity. Cushing, 994 F.3d at 55-56. The Speaker petitioned this Court for en banc review of the panel's judgment. We granted

the petition, withdrew the panel opinion, and vacated its judgment. Cushing, 2021 WL 2216970, at *1; see 1st Cir. I.O.P. X(D).[8]

**II.**

A request for a preliminary injunction is a request for extraordinary relief. It may be granted only if "the district court [finds] that all four of the relevant factors (that is, '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest') weigh[] in favor of granting the request." Comcast of Me./N.H., Inc. v. Mills, 988 F.3d 607, 611 (1st Cir. 2021) (quoting Shurtleff v. City of Bos., 928 F.3d 166, 171 (1st Cir. 2019)).

The District Court determined that the plaintiffs were not likely to succeed on the merits of their claims concerning the ADA and the RHA due to the Speaker's assertion of legislative immunity. See New Comm Wireless Services, Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party

[8] In addition to granting Speaker Packard's petition to rehear the case en banc on June 1, 2021, we requested supplemental briefing from the parties, and invited such briefing from amici, on the contours of legislative immunity and whether legislative immunity applies in a civil action seeking injunctive relief under the ADA and RHA. Cushing, 2021 WL 2216970, at *1-2.

cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."); see also Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth., 781 F.3d 571, 578 (1st Cir. 2015) (establishing that a plaintiff seeking a preliminary injunction must show a "strong likelihood that they will ultimately prevail on the merits of their" claims (quoting Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortunato, 699 F.3d 1, 10 (1st Cir. 2012)) (emphasis added) (internal quotation marks omitted)). The parties in their briefing have asked us to address only that ruling in this appeal, and we follow suit. Our review of the legal issues that the District Court's ruling presents is de novo. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citing Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000)).

As we will explain, the plaintiffs advance several grounds for concluding that the District Court erred in finding that legislative immunity stands in the way of their obtaining the extraordinary relief that they seek. We begin by describing the nature of the immunity itself. We will then address each of the plaintiffs' arguments in turn, though we conclude that none of them warrants our overturning the District Court's denial of the plaintiffs' motion for preliminary injunctive relief.

## III.

The Supreme Court of the United States has repeatedly affirmed that legislative immunity is an analogue to the Speech and Debate Clause of the federal Constitution that reflects the importance that Anglo-American law traditionally has placed on protecting "legislators acting within their traditional sphere" from being subject to suit. Tenney v. Brandhove, 341 U.S. 367, 376 (1951). The Court has explained in that regard that the "privilege of legislators to be free from . . . civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries" and "was deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution['s]" Speech and Debate Clause. Id. at 372; see also id. at 373 ("The provision in the United States Constitution was a reflection of political principles already firmly established in the States. Three State Constitutions adopted before the Federal Constitution specifically protected the privilege." (quoting 2 Works of James Wilson 38 (James DeWitt Andrews ed., 1896))).

The Court has further explained that this "privilege" from suit is "indispensabl[e]" to "enable and encourage a representative of the public to discharge his public trust with

firmness and success." Id. at 373. In other words, according to the Court, the reason to keep government officials "immune from deterrents to the uninhibited discharge of their legislative dut[ies is] not for their private indulgence but for the public good." Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency, 440 U.S. 391, 405 (1979) (quoting Tenney, 341 U.S. at 377)).

For that reason, the Court has made clear that, unlike some other common law immunities, legislative immunity may be asserted even against claims that seek only declaratory or prospective injunctive relief, see Sup. Ct. of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 732 (1980), and exists to protect those engaged in legislative activities from the burdens of defending against a suit and not merely from being held liable in one, see Tenney, 341 U.S. at 377. In addition, the immunity is absolute rather than qualified, insofar as it applies. See id. at 372.

**IV.**

We start with the plaintiffs' threshold contention, supported by the United States as amicus, that legislative immunity does not apply to the claims concerning the ADA and the RHA that are at issue, because those claims are brought against the State itself and not against the state officer named in the complaint as the sole defendant. The argument depends on two related

assertions: that (1) the plaintiffs' official capacity state officer claims -- even though the claims seek only declaratory and injunctive relief -- must be treated as claims against the State and not the officer named despite the fact that the State itself is not named; and (2) legislative immunity is a "personal immunity," which, unlike an "official" immunity like the sovereign immunity that a State may assert under the Eleventh Amendment to the United States Constitution, may only be asserted by an individual officer and not by the State itself. As we will explain, even if we may assume for present purposes that the second of these assertions is sound,[9] we cannot accept the first, at least on this record, given that the plaintiffs are the masters of their own complaint. Cf. Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002).

**A.**

The plaintiffs and the United States base the contention that the claims regarding the ADA and the RHA that they bring

---

[9] We note that neither the plaintiffs nor the United States addresses any of the seeming complexities that would appear to arise from naming the State alone as the defendant, given that the injunctive relief sought is directed solely against the Speaker. Nor do they cite any authority to support the contention that a suit that merely names the State but then seeks such equitable relief against a state legislative officer and no other actor or entity is not a suit to which legislative immunity applies. We will return to these points below.

against the Speaker in his official capacity must be treated as claims against the State itself in part on Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989), and Kentucky v. Graham, 473 U.S. 159 (1985). But, neither case supports our doing so here.

Those two cases do make clear that suits against state officers in their official capacity often must be treated as suits against the State, notwithstanding that such suits do not specifically name the State as the defendant. See Will, 491 U.S. at 71; Graham, 473 U.S. at 166-67. But, the Court expressly recognized in Graham and Will that, at least when such an official capacity state officer suit is brought under § 1983 for the kind of relief that is at issue here, it must not be treated as a suit against the State itself. See Will, 491 U.S. at 71 n.10 (holding that official capacity state officer suits for prospective injunctive relief are suits against a "person" under § 1983 even though a "State" is not a "person" under that statute); Graham, 473 U.S. at 167 n.14 ("[I]mplementation of state policy or custom may be reached in federal court only because official-capacity suits for prospective relief are not treated as actions against the state.").

The plaintiffs and the United States go on to assert, however, that even if an official capacity state officer suit for prospective injunctive relief need not be treated as a suit against

the State under § 1983, it must be so treated when it is brought to enforce Title II of the ADA and § 504 of the RHA. Thus, the plaintiffs argue, the claims concerning the ADA and the RHA at issue here must be so treated, despite the fact that the plaintiffs did not name the State as the defendant as to those claims and instead named only a state legislative officer.

To flesh out this contention, the plaintiffs and the United States explain that each of those underlying statutes, unlike § 1983, purports to make a "State" suable. They further explain that each of those statutes, also unlike § 1983, expressly imposes liability on, respectively, only a "public entity" and a "program or activity," neither of which is defined to include a state officer (or, for that matter any officer at all). See 42 U.S.C. § 12132; 29 U.S.C. § 794.

But, insofar as the plaintiffs and the United States mean to suggest that those features of the two statutes in and of themselves require us to treat the plaintiffs' claims as claims against the State, and not a state officer (despite the fact that the claims name the officer and not the State as the sole defendant), we cannot agree. To see why, though, it is necessary to consider the claims before us pertaining to each statute separately.

**1.**

With respect to the plaintiffs' claims to enforce Title II of the ADA, we note at the outset that the Supreme Court has made clear that an official-capacity suit against a state officer for injunctive relief may be brought to enforce the duties imposed by Title I of the ADA. See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 n.9 (2001). It has further made clear that, when such a suit is brought, it is properly treated as a suit against the officer and not the State itself, because such a suit would otherwise implicate the jurisdictional bar imposed by the Eleventh Amendment and thereby raise issues concerning Congress's constitutional power to effect an abrogation of sovereign immunity. See id. Moreover, the Court has so held notwithstanding both that a provision of the ADA purports to abrogate Eleventh Amendment immunity and that, unlike § 1983, Title I of the ADA imposes liability on States. See 42 U.S.C. § 12202.[10] That is significant for present purposes because a uniform body of lower court precedent holds for essentially the same reasons that such

[10] Graham does not itself support the notion that Congress's expressed intention to abrogate Eleventh Amendment immunity in enacting a statute in and of itself requires that we treat an official-capacity, state-officer claim brought under that statute for prospective injunctive relief as if it were against the State itself. See 473 U.S. at 167 n. 14 (noting the relevance of whether "Congress has overridden" Eleventh Amendment immunity) (emphasis added).

an official capacity state officer suit also may be brought to enforce Title II of the ADA and that, when it is brought, it also is properly treated as a suit against the officer named and not the State itself. See, e.g., Henrietta D. v. Bloomberg, 331 F.3d 261, 288-89 (2d Cir. 2003); Miranda B. v. Kitzhaber, 328 F.3d 1181, 1187-88 (9th Cir. 2003) (per curiam); Carten v. Kent State Univ., 282 F.3d 391, 397 (6th Cir. 2002); Randolph v. Rodgers, 253 F.3d 342, 348 (8th Cir. 2001).

Against this backdrop, we fail to see why we must treat the plaintiffs' claims to enforce Title II of the ADA as if they are not what they purport to be, such that we must treat them as if they are claims against the State of New Hampshire rather than a state officer (albeit in his official capacity only). After all, the plaintiffs do not suggest that we must treat their Fourteenth Amendment claims against the Speaker in his official capacity as if they are claims against the State itself, yet the plaintiffs name the Speaker, in his official capacity, as the sole defendant in those claims. And, as we have just explained, their claims to enforce the ADA are no less permissibly brought -- and treated -- as claims against the officer named (even though he is named only in his official capacity) and not the State than are their claims under the Fourteenth Amendment, despite the

distinctive features of Title II of the ADA that the plaintiffs and the United States highlight.

The plaintiffs and the United States, in arguing otherwise, do assert that a state officer sued in his official capacity may not assert legislative immunity precisely because that officer is not being sued in his individual capacity. Here, they rely on the statement in Graham that "the only immunities that can be claimed in an official capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment." 473 U.S. at 167.

But, that dictum cannot control our analysis here, given the Court's express holding in Consumers Union that legislative immunity may be asserted as a defense against an official capacity suit against a state officer for the kind of relief that is at issue here. See 446 U.S. at 737 n.16, 738-39; id. at 732 ("Although Tenney involved an action for damages under § 1983, its holding is equally applicable to § 1983 actions seeking declaratory or injunctive relief."); Colon Berrios v. Hernandez Agosto, 716 F.2d 85, 88 (1st Cir. 1983) (relying on Consumers Union in holding that "the Supreme Court has clearly held that state legislators acting in a legislative capacity are absolutely immune from the imposition of equitable remedies in a suit brought under 42 U.S.C. § 1983"). Indeed, Graham itself seems to have recognized Consumers Union's

holding on this very point. 473 U.S. at 167 n.14. Thus, if we must take the plaintiffs' claims at their word and understand them to be claims against the Speaker in his official capacity and not claims against the State itself, there is no inherent bar to the defendant -- owing to the nature of that defendant -- asserting the immunity at issue here.

The plaintiffs and the United States do respond by pointing to Board of Commissioners, Wabaunsee County v. Umbehr, 518 U.S. 668 (1996), which was decided after Consumers Union. They contend that precedent shows that the Speaker, insofar as he is being sued in his official capacity, cannot assert legislative immunity, notwithstanding what Consumers Union says on that score. They note that Umbehr states that legislative immunity "extends to public servants only in their individual capacities," 518 U.S. at 677 n.*, and holds on that basis in that case that "the legislative immunity claim is moot," because "only claims against the Board members in their official capacities" were before the Court. Id.

But, here, too, we disagree. Umbehr does not purport to overrule Consumers Union, as Umbehr does not even mention Consumers Union, and we do not see how we may read Umbehr to overrule Consumers Union by implication. Umbehr involved an official capacity claim against municipal rather than state officers under § 1983. The Court has long treated § 1983 claims against municipal

defendants differently from § 1983 claims against state ones. See, e.g., Graham, 473 U.S. at 167 n.14. Neither the plaintiffs nor the United States identifies any authority that supports a contrary conclusion, despite the substantial body of authority that rejects the notion that Umbehr overrides Consumers Union with respect to official capacity suits against an officer of the State. See, e.g., State Empls. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 86 (2d Cir. 2007) ("While legislative immunity is available to local officials who are sued in their individual capacities, the Supreme Court has made clear that, due to the historical unavailability of various immunity defenses to local governments, those governments (or, 'municipal corporations') are not entitled to the benefit of any immunities that might be available to local officials sued under § 1983. The Supreme Court has never reached a similar conclusion with respect to suits against states, or against state agents in their official capacities." (internal citations omitted)); Scott v. Taylor, 405 F.3d 1251, 1255 n.6 (11th Cir. 2005) ("Umbehr involved a § 1983 official capacity claim against local governmental officials. Accordingly, the general rule of Graham applied whereby the official capacity claim was to be treated as a claim against the entity and personal immunities

would not be available. Umbehr, like Graham, is entirely consistent with the holding of Consumers Union.").[11]

Thus, the plaintiffs fail to persuade us that their claims in which they seek to enforce Title II of the ADA are properly understood to be claims against the State, despite how they were pleaded.[12] Accordingly, we proceed on the understanding that the named defendant is the Speaker in his official capacity rather than the State and that, as such, he is entitled to assert

[11] We note that Umbehr was decided prior to Bogan v. Scott Harris, 523 U.S. 44 (1998). There, the Court resolved that municipal officials were entitled to assert legislative immunity when sued in their individual capacity, see id. at 53-54, which was an open question at the time that the Court handed down its decision in Umbehr. Moreover, Umbehr cited as support for its treatment of the official capacity claims at issue, Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993), which concerned the proper treatment of official capacity claims only against municipal officers. See Umbehr, 518 U.S. at 677 n.*.

[12] Notably, the ADA's operative provisions refer to a "public entity," see 42 U.S.C. § 12132, and the parties do not dispute that the House would qualify as one no less than the State itself would. Yet, the plaintiffs at no point explain why their claims to enforce Title II of the ADA, insofar as they must be treated as claims against a "public entity" and not an officer, must be treated as claims against the State rather than the House, even though the plaintiffs named an officer of that legislative body as the defendant for those claims. That failure on the plaintiffs' part is problematic in its own right, because Consumers Union expressly states that legislative bodies may themselves assert legislative immunity. See 446 U.S. at 733-34.

the immunity at issue per Consumers Union, absent there being some bar to his doing so.[13]

**2.**

The problems with treating the plaintiffs' claims to enforce the RHA as being against the State rather than the officer named in the complaint are somewhat different, though related. Like Title II of the ADA, and unlike § 1983, § 504 of the RHA does expressly provide that "State[s]" are liable for violating its terms. See 29 U.S.C. § 794(b)(1)(A)-(B). And, § 504 of the RHA,

---

[13] The plaintiffs, in arguing that their claims to enforce the ADA are claims against the State, even though their Fourteenth Amendment claims are not, do not develop an argument that those claims pertaining to Title II of the ADA simultaneously also are not claims against the State for purposes of determining whether they implicate Eleventh Amendment immunity. See United States v. Zannino, 895 F.2d 1, 16 (1st Cir. 1990) (discussing waiver). Thus, if we were to treat the plaintiffs' ADA-related claims as if they were claims against the State and no other defendant, then those claims would be subject to an assertion of Eleventh Amendment immunity that they otherwise would not implicate. See Garrett, 531 U.S. at 374 n.9 (establishing that, with respect to Title I of the ADA, an official capacity suit for injunctive relief may proceed under the fiction of Ex parte Young, 209 U.S. 123 (1908)). In consequence, the plaintiffs' claims would then raise questions regarding Congress's constitutional authority to abrogate Eleventh Amendment immunity that otherwise would not arise. See Tennessee v. Lane, 541 U.S. 509, 520 (2004) (detailing a "congruence and proportionality" test for determining whether a suit under Title II of the ADA against the State may proceed (quoting City of Boerne v. Flores, 521 U.S. 507, 520 (1997))); see also Scott v. Taylor, 405 F.3d at 1255 n.5 (11th Cir. 2005) ("If official capacity actions against state legislators were treated as actions against the State, they would be barred by states' Eleventh Amendment sovereign immunity.").

like Title II of the ADA, does not expressly provide that any officer of a state is subject to suit. Section 504 of the RHA imposes liability on "program[s] or activit[ies] receiving Federal financial assistance," which the provision then defines to include governmental entities. See 29 U.S.C. § 794(a)-(b).

But, as with Title II of the ADA, neither the plaintiffs nor the United States points to any precedent that holds that suits against state officers -- even when sued in their official capacity -- to enforce the provisions of § 504 of the RHA through relief of the kind at issue here may not be brought. Nor do they suggest that there is a reason to conclude that such suits, insofar as those suits may be brought to enforce the RHA, must be treated as suits against the State, even if those suits need not be so treated when brought to enforce Title II of the ADA. Moreover, as with Title II of the ADA, there is authority that holds that such suits may be brought to enforce § 504 of the RHA and that, when they are so brought, they are properly treated as suits against the officer and not the State. See Henrietta D., 331 F.3d at 289. And, as we have already explained, given Consumers Union, the dictum in Graham regarding the distinction between official and personal immunities provides no basis for our concluding that we must treat such suits as suits against the State for purposes of assessing assertions of legislative immunity. Accordingly, the plaintiffs fail to explain

why we cannot take their RHA-predicated claims, as pleaded, to be, like their claims regarding the ADA, just what they purport to be. That being so, we understand the plaintiffs' RHA-related claims to be, like their ADA-related claims, against a kind of defendant who is not -- inherently -- incapable of asserting the immunity that is at issue.

The United States argues that the Eleventh Amendment concerns that might arise from treating the plaintiffs' claims to enforce Title II of the ADA as claims against the State itself would not arise from so treating their RHA-related claims. The plaintiffs and the United States emphasize that the State itself is a "recipient of Federal financial assistance" within the meaning of § 504 of the RHA. 29 U.S.C. § 794(a). The United States thus contends that, given the State of New Hampshire's acceptance of "Federal financial assistance" to support legislative operations during the pandemic, there was a clear waiver of Eleventh Amendment immunity here, and so no Eleventh Amendment concern that the plaintiffs would have needed to avoid by suing only a state officer and not the State itself. See 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment . . . for a violation of section 504 of the Rehabilitation Act of 1973 . . . or . . . any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.").

But, there could be a question of whether the State had waived its Eleventh Amendment immunity by that receipt of funds, given that the relief that the plaintiffs seek would run against a state legislative, rather than a state executive, officer. Cf. Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 171 (3d Cir. 2002) ("Under the statutory definition in the Rehabilitation Act, the state, as a whole, cannot be a 'program or activity.' As other courts have noted, if the entire state government were subject to § 504 whenever one of its components received federal funds, section (b)(1)(B) would be redundant."). By contrast, no such question arises if the plaintiffs' claims to enforce the RHA are taken at their word and treated as claims against the named state officer in his official capacity rather than the State. For, in that event, Eleventh Amendment immunity is not in play.

In addition, the plaintiffs do not explain why if their claims regarding the RHA must be understood to be against an entity rather than an officer, they must be understood to be against the State rather than the House, given that the officer named in the complaint as the sole defendant is a member of the House, which the parties do not dispute is a covered entity under § 504 of the RHA. See 29 U.S.C. § 794. And, as we have explained, Consumers Union expressly states that a legislative body may itself assert legislative immunity. So, had the plaintiffs named the State in

their complaint, a question would then have arisen in relation to the relief sought as to whether the right entity had been named, given that if the House were the proper entity (insofar as an officer suit was not being brought) legislative immunity would have remained as a viable defense. See Consumers Union, 446 U.S. at 732.[14]

**3.**

In sum, neither the plaintiffs nor the United States persuasively explains why the official capacity state officer claims regarding the ADA and the RHA that are before us must be treated as if they are claims against the State itself and thus against a defendant that the plaintiffs assert to be, by its nature, incapable of asserting legislative immunity. Accordingly, we take the complaint at its word. We thus understand it to be

[14] We note that the plaintiffs disclaimed any intention to have sued any defendant other than the State only after having been confronted with a defense of legislative immunity based on Consumers Union in response to their motion for preliminary injunctive relief. But, that otherwise previously unarticulated position does not effectively amend the complaint. Nor is this a case in which the entity of which the officer sued is a part "had no greater separate identity from the" State -- which is a suable entity under the ADA and the RHA -- than many executive departments do. Brandon v. Holt, 469 U.S. 464, 472 (1985). Rather, it is a case in which the officer named in the complaint serves in one of the two houses of a coordinate branch of state government and thus is not, for purposes of enforcing either statute, obviously "the State" -- insofar as the officer named is a stand-in for any entity -- rather than either the House or the state legislature as a whole.

alleging claims that seek to enforce Title II of the ADA and § 504 of the RHA against the state officer (in his official capacity) who is named, which, as Consumers Union holds, is an officer who is entitled even in that capacity to assert the defense of legislative immunity, at least insofar as that officer is not otherwise barred from doing so.

**V.**

The plaintiffs do also assert -- this time, without the support of the United States -- that their ADA-predicated claims may go forward, despite the Speaker's assertion of legislative immunity, even if they are understood to be claims against a state officer rather than the State itself, despite the Speaker's assertion of legislative immunity. That is in part because the plaintiffs contend that, in enacting Title II of the ADA, Congress abrogated any legislative immunity that such a defendant otherwise could assert. But here, too, we disagree.

As an initial matter, it is not obvious how Title II of the ADA could bring about such an abrogation, insofar as the suit is against a state legislative officer and not any "public entity" under that statute. Nonetheless, a legislative body, like the House, appears to be a "public entity" under Title II of the ADA and to be capable of asserting legislative immunity in certain circumstances per Consumers Union. See 446 U.S. at 733-34. In

addition, the plaintiffs appear to be of the view that Title II of the ADA -- through its various provisions -- may be understood to abrogate legislative immunity even when asserted by a state legislative officer as a defense to a claim to enforce the statute that is brought against that officer in his official capacity and not against any "public entity" with which he is identified. Thus, we proceed to address the abrogation argument that the plaintiffs present as they have framed it for us and as the panel addressed it. But, as we will explain, even when we do so, we find the plaintiffs' abrogation argument to be without merit, in large part due to the reasoning of Tenney.

**A.**

The plaintiff in Tenney, William Brandhove, had sued members of the California Senate's Fact-Finding Committee on Un-American Activities under 42 U.S.C. § 1983 and a companion civil rights measure that provided redress against those who conspire to deprive individuals of their federal constitutional rights. See 42 U.S.C. § 1985. Brandhove alleged they had used a legislative subpoena to "intimidate and silence" him, in an attempt to "deter and prevent him from effectively exercising his constitutional rights of free speech and to petition the Legislature for redress of grievances." 341 U.S. at 371. He pointed out that not a word in either statute recognized legislative immunity and that, in

fact, the text of each statute encompassed both legislators and their legislative acts by applying to any "person" who was acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." 42 U.S.C. § 1983. He thus contended that legislative immunity posed no bar to his claims.[15]

In holding otherwise, the Court framed the relevant interpretive question as follows: Did Congress intend "to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here" and thereby to "subject legislators to civil liability for acts done within the sphere of legislative activity?" Id. at 376. The Court then reasoned -- perhaps not surprisingly, given that framing -- that it could not conclude that Congress had so intended:

> Let us assume, merely for the moment, that Congress has constitutional power to limit the freedom of State legislators acting within their traditional sphere. That would be a big assumption. But we would have to make an eve[n] rasher assumption to find that Congress thought it had exercised the power. These are difficulties we cannot hurdle. . . . We cannot believe that Congress -- itself a staunch advocate of legislative freedom -- would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us.

---

[15] See Brief for Respondent at 17, Tenney v. Brandhove, 341 U.S. 367 (1951) (No. 338).

Id.

In the decades since, the Court has shown no inclination to back away from Tenney's interpretive logic. Rather, in subsequent cases applying common-law immunities to § 1983 claims, the Court has explained that Tenney held that § 1983 did not abrogate such immunities both because "the legislative record [gave] no clear indication that Congress meant to abolish [them] wholesale" and because it was fair to "presume that Congress would have specifically so provided had it wished to abolish the doctrine[s]." Pierson v. Ray, 386 U.S. 547, 554-55 (1967).

In accord with that same understanding, the Court has, in the wake of Tenney, appeared to equate the inquiry into Congress's intent to abrogate legislative immunity with the famously strict inquiry that is required to determine Congress's intent to abrogate Eleventh Amendment immunity. See Consumers Union, 446 U.S. at 738-39. It has also appeared to hold that evidence of an intent by Congress to abrogate the latter type of immunity is not evidence of its intent to abrogate the former. Id. Indeed, the Court has even gone so far as to state, seemingly as a general matter, that "[o]ur cases have proceeded on the assumption that common-law principles of legislative . . . immunity were incorporated into our judicial system and that they

should not be abrogated absent clear legislative intent to do so." Pulliam v. Allen, 466 U.S. 522, 529 (1984).

The plaintiffs do argue that, even if Tenney sets forth a clear statement rule for abrogating legislative immunity, it applies only to § 1983 itself. But, they do not offer any supporting authority for that contention, and there is sister circuit precedent directly to the contrary. See Chappell v. Robbins, 73 F.3d 918, 923-25 (9th Cir. 1996) (applying clear statement rule to determine whether Congress intended to abrogate legislative immunity with respect to a civil claim under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.).[16]

In addition, the cases in the Tenney line repeatedly affirm the important role that legislative immunity plays in promoting representative democracy and thus the soundness of Tenney's presumption that Congress, as a legislative body in its

[16] We note that the Supreme Court has required at least as much clarity as Tenney required in determining whether other federal statutes have displaced the immunity that members of Congress enjoy under the Speech and Debate Clause. See United States v. Helstoski, 442 U.S. 477, 493 (1979) ("Assuming, arguendo, that the Congress could constitutionally waive the protection of the Clause for individual Members, such a waiver could be shown only by an explicit and unequivocal expression. There is no evidence of such a waiver in the language or the legislative history of § 201 or any of its predecessors." (second emphasis added)).

own right, would not likely override such a critical protection for legislative freedom without evidencing its serious consideration of the merits of doing so. Indeed, the Court in Tenney began its analysis by characterizing the notion that Congress could abrogate the immunity generally as a "big assumption," 341 U.S. at 376, which is a characterization that certainly accords with the notion that the concern about finding abrogation was rooted in a recognition that any such abrogation would implicate the federal-state balance. Cf. Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) ("Congressional interference . . . would upset the usual constitutional balance of federal and state powers. For this reason, 'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance." (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 243 (1985))). Thus, if anything, there would appear to be particular reason to presume that Congress would not have abrogated such a longstanding immunity -- which is both discrete in nature and unusually salient to the legislative branch -- in the statute at issue here without making its intent to do so clear, given that Congress enacted this statute when Tenney was already established precedent.

Accordingly, to determine whether Congress intended to abrogate legislative immunity by enacting Title II of the ADA, we

proceed on the view that such abrogation could not take place "absent clear legislative intent to do so." Pulliam, 466 U.S. at 529. And, as we will next explain, given that understanding, the plaintiffs fail to persuade us that the District Court erred in determining that Title II of the ADA did not abrogate legislative immunity.

**1.**

To make the contrary case, the plaintiffs rely on the text of Title II of the ADA. The operative provision of the statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute that defines a "public entity" does so broadly to include "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). It also makes clear that Congress intended the statute to be read broadly to ensure that it would have an encompassing scope. See generally 42 U.S.C. § 12101(b)("It is the purpose of this chapter . . . to provide a clear and comprehensive mandate for the elimination of discrimination against individuals with disabilities.").

Moreover, as the plaintiffs highlight, a separate provision of the ADA that applies to the claims at issue here provides as follows:

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202.

**2.**

The plaintiffs' chief contention regarding abrogation relies on the second sentence of this last provision. They contend that it must be read to manifest Congress's clear intent to abrogate the specific immunity at issue here, because it expressly provides that the "remedies" available under this statute in an action against a "State" are the same as those that would be available against a "private entity" and legislative immunity is not an immunity that any private entity may assert.

But, the provision that contains this sentence is substantively identical to 42 U.S.C. § 2000d-7(a)(2), which we know that Congress added to the RHA years earlier in the immediate wake of the Supreme Court's decision in Atascadero to ensure that

the clear statement requirement for dispensing with Eleventh Amendment immunity would be met. See H.R. Rep. No. 101-485, pt. 2, at 138 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 421 ("This provision is included in order to comply with the standards for covering states set forth in Atascadero."). After all, Atascadero had held that a prior provision of the RHA that had purported to provide a means by which a State could effect a waiver of Eleventh Amendment immunity was unclear as to whether it covered claims against a State for certain types of remedies. See 473 U.S. at 245-46.

Thus, the second sentence of this same provision in the ADA would appear -- like the second sentence in its predecessor in the RHA -- to have been intended merely to make clear that the Eleventh Amendment immunity referenced in the first sentence extends to all types of remedies that may be sought against states. That the sentence in question refers only to "remedies" and not "immunities" and that the legislative history to this provision makes no reference to any immunity other than Eleventh Amendment immunity both accord with that same conclusion. See Lussier v. Fla., Dep't of Highway Safety & Motor Vehicles, 972 F. Supp. 1412, 1418-19 (M.D. Fla. 1997) (rejecting the argument that the second sentence of 42 U.S.C. § 12202 "creates an exception to the jurisdictional bar leveled by the Tax Injunction Act"); see also

28 U.S.C. § 1341 (precluding federal courts from considering challenges to a State law that facilitates "the assessment, levy or collection of any tax"). So, too, does the fact that the provision concerns only actions against "State[s]," given that the immunity here applies to actors at all levels of government. See, e.g., Bogan, 523 U.S. 44 (applying legislative immunity to a suit involving a municipal legislator); Lake Country Ests., 440 U.S. 391 (applying legislative immunity to a suit involving a regional legislative body). Accordingly, consistent with general interpretive principles, we decline to treat this sentence as if it were a means of effecting a sweeping abrogation of such an important immunity, when it appears as a follow-on to a sentence that expressly dispenses with a distinct immunity without itself making reference to any immunity at all. See Conservation Law Found., Inc. v. Pruitt, 881 F.3d 24, 32 (1st Cir. 2018) ("Congress does not hide elephants in mouseholes." (citing Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001))).

To be sure, Congress did manifest its clear intent to abrogate Eleventh Amendment immunity via 42 U.S.C. § 12132, as the first sentence of the provision just considered makes perfectly evident. But, the fact that Congress clearly intended to abrogate the status-based immunity that the Eleventh Amendment protects does not in and of itself clearly demonstrate that Congress

intended to abrogate the conduct-based immunity for those engaged in legislative activities that is at issue here. See Walker v. Jones, 733 F.2d 923, 931 (D.C. Cir. 1984) ("The 'fundamental purpose' of [legislative immunity] is to 'free[] the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator.'" (quoting Gravel v. United States, 408 U.S. 606, 618 (1972) (second alteration in original) (emphasis added and omitted))). Indeed, as we have already noted, the Court has indicated that evidence of an intent to abrogate Eleventh Amendment immunity is not itself evidence of an intent to abrogate legislative immunity. Consumers Union, 446 U.S. at 738.

Thus, to the extent that any such abrogation of legislative immunity was intended, the evidence of that intention must be located elsewhere in Title II of the ADA. In considering whether such evidence exists, we do not dispute the plaintiffs' assertion that the "activities" of the House are encompassed by the statute's operative provisions, which encompass the "activities" of the State and "any department, agency, special purpose district, or other instrumentality of" it. See 42 U.S.C. §§ 12131, 12132. But, we agree with the Speaker that, even so, those provisions do not themselves demonstrate that Congress intended to abrogate legislative immunity by enacting this statute.

Like the Court in Tenney, "[w]e cannot believe that Congress -- itself a staunch advocate of legislative freedom --" would abrogate legislative immunity "by covert inclusion in the general language" of Title II of the ADA. 341 U.S. at 376. Indeed, the fact that Congress expressly saw fit to abrogate Eleventh Amendment immunity as to actions against states brought under it, but then made no reference to legislative immunity, supports that conclusion.[17] Cf. Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) ("The maxim [expressio unius est exclusio alterius] instructs that, when [a statute lists specific items], any item not so listed is typically thought to be excluded. While this interpretive maxim is not always dispositive, it carries weight . . . ." (internal citations omitted)).

---

[17] Congress, in enacting Title II, "directed the Department of Justice . . . to elucidate Title II['s statutory language] with implementing regulations," Frame v. City of Arlington, 657 F.3d 215, 225 (5th Cir. 2011); see 42 U.S.C. § 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement [Title II]."). The implementing regulations provide that Title II of the ADA covers "activities of the legislative and judicial branches of State and local governments." See Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,694, 35,696 (July 26, 1991) (codified at 28 C.F.R. pt. 35).

But, we cannot conclude that Congress's general grant of rulemaking authority reveals that "the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." Will v. Michigan Dep't of State Police, 491 U.S. at 66 (1989) (quoting United States v. Bass, 404 U.S. 336, 349 (1971)).

That is not to say that there is a "magic words" test any more than there is such a test for abrogating Eleventh Amendment immunity. United States v. Texas, 507 U.S. 529, 534 (1993); see Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73-74 (2000); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 56-57 (1996). But, in addition to the fact that the statute here makes no express reference to legislative immunity, it also makes no express reference to legislatures or legislators, compare 18 U.S.C. § 201(a)(1), with 42 U.S.C. § 12131, let alone to legislative acts. See also United States v. Brewster, 408 U.S. 501, 524 (1972) ("Congress, of course, is free to exempt its Members from the ambit of federal bribery laws, but it has deliberately allowed [18 U.S.C. § 201] to remain on the books for over a century."). Nor does Title II of the ADA otherwise indicate an intent by Congress to deal with the "subtle considerations of the mixture of legislative or executive duties with the political facts of life," Bostick v. Rappleyea, 629 F. Supp. 1328, 1333 (N.D.N.Y. 1985) (quoting Gerhart v. Oregon, 40 F. Supp. 597, 600 (D. Ore. 1976)), as Title VII of the Civil Rights Act of 1964 and the Age Discrimination and Employment Act do. See id.

Instead, the operative provisions of Title II of the ADA merely contain a general reference to the "activities" of the "public entit[ies]" to which Title II of the ADA applies and then

define those "entit[ies]" in terms that are themselves "general" with respect to the acts that could trigger the immunity at issue. 42 U.S.C. § 12132. In that respect, Title II of the ADA is not like the statutes in Kimel or Seminole Tribe when it comes to manifesting a congressional intent to abrogate a well-established immunity by expressly naming the very kind of defendant that enjoys the immunity. Instead, it is more like § 1983, which, as we have seen, the Court determined in Tenney does not suffice to manifest a clear congressional intent to abrogate legislative immunity, because the Court could not accept that Congress would abrogate legislative immunity by "covert inclusion" in the "general language" of § 1983, notwithstanding that a state legislator performing legislative duties would appear to be a "person" who is acting "under color of" law, insofar as those words are given their ordinary meaning. See 341 U.S. at 376.[18]

---

[18] The plaintiffs suggest that the Supreme Court's holding in Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206, 209-10 (1998), indicates that Title II's reference to "State or local government[s]," 42 U.S.C. § 12131, provides sufficiently clear language to effect an abrogation of legislative immunity. In Yeskey, the Court considered whether Title II of the ADA's standards applied to state correctional facilities, and the Court concluded that such facilities fall "squarely within the statutory definition of 'public entity'." Yeskey, 524 U.S. at 210. But, neither party disputes that Title II of the ADA applies to the "programs and activities" of the House, as neither party disputes that it is a "public entity." We are concerned with a question distinct from the one presented in Yeskey, as the question here concerns not the meaning of "public entity" but whether Title II

**B.**

The plaintiffs also make the closely related contention that their claims under § 504 of the RHA are not subject to the Speaker's assertion of legislative immunity, because any legislative immunity that the Speaker might enjoy against their RHA claims has been waived. That is so, they contend, given that the New Hampshire General Court "affirmatively sought and accepted federal funding to pay for legislative session expenses" pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). Here, they rely on § 504 of the RHA, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a); see also id. § 794(b)(1)(A)-(B). For, as they contend, the New Hampshire General Court's acceptance of federal funding effected a waiver of the Speaker's legislative immunity in light of 42 U.S.C. § 2000d-7(a)(1).

---

of the ADA effected an abrogation of the immunity traditionally enjoyed by certain acts taken in the course of the activities of a "public entity." And, as to that question, we conclude that Tenney provides the controlling interpretive rule.

But, the plaintiffs do not suggest that a statute may be any less clear in encompassing legislative immunity when it provides a means for that immunity's waiver than it must be when it provides for its abrogation. Nor do we see how they could so contend. See Atascadero, 473 U.S. at 241. Thus, because the terms of 42 U.S.C. § 2000d-7 are not materially different from the terms of 42 U.S.C. § 12202 -- in that they, too, do not speak to the immunity at issue with the requisite degree of clarity, concerned as they are only with a distinct immunity, Eleventh Amendment immunity -- the plaintiffs' waiver-based argument for showing that the District Court erred in denying their motion for preliminary injunctive relief fails.

## VI.

We come, then, finally, to the plaintiffs' case-specific reasons for concluding that legislative immunity poses no bar to their request for preliminary injunctive relief. But, once again, we are not persuaded.

### A.

We start with the plaintiffs' contention that legislative immunity is no obstacle to their obtaining an emergency injunction because their federal law claims do not seek to hold the Speaker liable for any "legislative act." The plaintiffs argue in this regard that their claims target only the Speaker's failure

to permit them to engage remotely in official legislative proceedings -- including his failure to permit them to vote on bills in that manner.

But, "voting by Members" itself constitutes a legislative act, see Gravel, 408 U.S. at 624, and the plaintiffs request an accommodation with respect to the House rules that purport to bar the remote participation that they seek. Thus, we fail to see on this record a material difference between their requested injunctive relief and a request for relief that would seek to dictate the setting of the rules themselves. See Consumers Union, 446 U.S. at 726, 728-29 (explaining that legislative immunity applied to a suit against the Chief Justice of Virginia in his official capacity that sought prospective injunctive relief for his "failure to amend" a state bar rule that was alleged to violate the First Amendment); see also Larsen v. Senate of Commonwealth of Pa., 152 F.3d 240, 253 (3d Cir. 1998) (considering "whether [the] request for prospective relief . . . could be accorded consistent with the policies underlying legislative immunity"). That being so, the plaintiffs fail to persuade us that there is no basis for applying legislative immunity because there is no legislative "act presented for examination." Walker, 733 F.2d at 929.

We do recognize that legislative immunity does not attach to the activities that are merely "casually or incidentally related to legislative affairs." Brewster, 408 U.S. at 528. But, determinations about the procedures that govern the means by which House members may cast votes are not easily so characterized, and the injunctive relief that the plaintiffs seek is, on their own account, relief that must run against a legislator directly to be effective. Nor do the plaintiffs identify any authority that would support a "casual" or "incidental" characterization, id., even though there is seemingly contrary recent authority from the D.C. Circuit. See McCarthy v. Pelosi, 5 F.4th 34, 39 (D.C. Cir. 2021).[19] Thus, the plaintiffs fail to make the case that, for this reason, the District Court erred in relying on the Speaker's legislative immunity to reject their request for emergency relief.

---

[19] The plaintiffs do argue at some length that, to determine whether the accommodation that they seek is reasonable would not require any inquiry into legislative motive or even any questioning of any legislative officer and that, for this reason, the assertion of legislative immunity is no bar to their claims. But, even if we were to assume that the plaintiffs accurately predict how the litigation would unfold, that prediction does not suffice to permit the plaintiffs to show that the District Court erred in denying their request for injunctive relief based on legislative immunity, given that the immunity protects the one who enjoys it from the suit itself. See Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 28 (1st Cir. 1996).

**B.**

The plaintiffs separately contend that, because comity is the basis for legislative immunity, the Speaker may assert that immunity here only to the extent that New Hampshire law would permit him to do so. The plaintiffs then point us to decisions of the New Hampshire Supreme Court that they contend show that the immunity enjoyed by the Speaker is qualified and applies only if the legislative acts in question "do not infringe upon the fundamental rights of the people." See, e.g., Burt v. Speaker of the House of Representatives, 243 A.3d 609, 610 (N.H. 2020).

But, the scope of the legislative immunity that we must recognize in construing federal statutes is not dependent on the immunity that a state itself recognizes under its own law. See Lake Country Ests., 440 U.S. at 404 ("[T]he absolute immunity for state legislators recognized in Tenney reflected the Court's interpretation of federal law; the decision did not depend on the presence of a speech or debate clause in the constitution of any State, or on any particular set of state rules or procedures available to discipline erring legislators."). For this reason, it is of no relevance here that the Speaker might not be able to assert such a defense against claims brought under New Hampshire law.

### C.

There remains to address the plaintiffs' final argument for rejecting the District Court's legislative-immunity-based denial of their motion for a preliminary injunction, though it is one that they barely developed in the District Court or before the panel. This argument rests on the potential limit on the immunity discussed in Kilbourn v. Thompson, 103 U.S. 168 (1880).

In that case, the Court explained that "there may . . . be things done, in the one House or of the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." Id. at 204. In line with Kilbourn, we have recognized that that "there may be some conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 634 (1st Cir. 1995).

Kilbourn made quite clear that standard for an "act" to be deemed of "extraordinary character" is a most demanding one. In fact, in sketching out the high bar a legislative act would need to clear before being deemed an act of "extraordinary character," such that a legislator could be sued for it, the Court in Kilbourn considered, as a possibility, that "members of

[Congress could go] so far to forget their high functions and the noble instrument under which they act as to imitate the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French Assembly in assuming the function of a court for capital punishment." 103 U.S. at 204-05. In the event legislators engaged in conduct so clearly exceeding the powers delegated to them, the Court -- quite understandably -- was "not prepared to say that such an utter perversion of their powers to a criminal purpose would be screened from punishment by the constitutional provision for freedom of debate." Id.

The fact that the Speaker's conduct implicates as important a statutory right as the ones protected by Title II of the ADA and § 504 of the RHA thus does not, in and of itself, provide us with a sufficient basis under the Kilbourn standard for concluding that the District Court erred in determining that the plaintiffs were not entitled to their requested emergency relief. Indeed, the fact that some of their claims assert a violation of the Fourteenth Amendment does not in and of itself suffice to do so. Cf. Bogan, 523 U.S. at 46-47, 55 (finding that legislative immunity barred a First Amendment retaliation claim, where the plaintiff alleged that she had been fired as a result of her filing a complaint against an employee working under her supervision); Tenney, 341 U.S. at 370-71, 376-79 (determining that legislative

immunity barred the plaintiffs' First Amendment claim, premised on the state legislature's request that state officials prosecute him for his failure to testify at a committee hearing). See generally Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 509-12 (1975) (holding that the Speech or Debate Clause barred the plaintiffs' claims, premised on the plaintiffs' allegations that a Senate subcommittee subpoena, if complied with, would constitute an invasion of the plaintiffs' privacy and violate their First Amendment rights).

Moreover, the plaintiffs take aim at conduct by the Speaker that involves a decision to follow -- rather than depart from -- existing House rules that were overwhelmingly passed and that were predicated on a general handbook for setting such rules for all legislatures generally. The challenged conduct by the Speaker also does not, on its face, target any class of legislators either expressly or through clever artifice, in part because it involves adhering to existing rules rather than making new ones. Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993). The remedy sought for that decision to stick to those existing rules, we also note, is an injunction that would run directly against a legislator and not merely a legislative employee.

We note as well that this case is distinct from Powell v. McCormack, 395 U.S. 486 (1969). There, the Court confronted the refusal of the United States House of Representatives to permit the plaintiff "to take his seat," see id. at 489, 506-08, despite his having been duly elected as a member, and the Court permitted relief that would run against an employee of the House and not a legislator. See id. at 504-06.[20]

That said, we recognize, as the Court has recognized in its decisions preserving legislative immunity, that immunities are susceptible to abuse. It takes no great imagination to conjure hypotheticals that might warrant the "extraordinary character" descriptor if carried out. For that reason, the assessment of when a given act that, though seemingly legislative in nature, is nonetheless "of an extraordinary character," Kilbourn, 103 U.S. at 204, that makes it unworthy of the immunity's protection must be sensitive to context.

---

[20] We note that Bond v. Floyd, 385 U.S. 116 (1966) similarly involved a challenge to actions of the Georgia House of Representatives to "exclude" a "duly elected representative" from "membership" in that legislative body, see id. at 120, and that it did not address legislative immunity. See also Rash-Aldridge v. Ramirez, 96 F.3d 117, 119 (5th Cir. 1996) (finding legislative immunity applicable, despite the holding in Bond, because the relevant legislature "did not try to remove [the plaintiff] from her seat . . . nor [did it] take away any privileges of that office because of what she said or did").

Here, the challenge concerns a denial of a request for extraordinary relief against a legislator that was made below with no development of how the Speaker's actions are comparable to any of the hypotheticals concerning never-undertaken legislative acts that the dissent describes. That only reinforces the reason to ensure that our focus is on the character of the legislative act being challenged and not those that have never been made based on records that do not exist. We do not decide, therefore, more than that, given the facts and circumstances of this case, there is no basis for concluding that the District Court erred in making the only ruling that is before us in this appeal: denying the request for emergency relief against the Speaker due to the Speaker's decision not to make the kind of accommodation with respect to House Rule 65 that the plaintiffs seek.

We do emphasize, though, one final point that takes us back to the reasons that the Court gave in Tenney for concluding that legislative immunity had been incorporated into American law and that federal statutes are appropriately construed with that understanding in place. The immunity serves an important democratic end notwithstanding that it insulates elected representatives from legal challenges for certain of their official actions. For that reason, we must be cognizant -- as the Court has instructed us to be -- of the risks associated with

failing to respect the traditional scope of legislative immunity, bounded though it is, out of respect for legislative freedom and thus democratic self-government. See Eastland, 421 U.S. at 501-03.

Too narrow a construction of that immunity -- and one not sufficiently respectful of the high bar that Kilbourn plainly intended to set for stripping seemingly protected acts from the cover the immunity confers -- invites abuses of its own. Those abuses may involve not only federal judges improperly intruding into internal state legislative affairs but also warring sides in partisan state legislators' battles improperly enlisting federal judges to participate in them. See E.E.O.C. v. Wash. Suburban Sanitary Comm'n, 631 F.3d 174, 181 (4th Cir. 2011) ("As members of the most representative branch, legislators bear significant responsibility for many of our toughest decisions . . . . [Legislative immunity] shields them from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box.").

We do not suggest that any such effort by the plaintiffs is at play here, and we appreciate the seriousness of the health threat that this virus poses. We do emphasize, though, that the immunity exists not merely to protect against the fact of such enlistment in a given case but also to protect against the

possibility of that enlistment in a future case.[21] That Congress would be better attuned than the judiciary to the possibility that such abuses might occur in the absence of the immunity seems clear enough. That recognition provides yet another reason -- and one that Tenney itself may be understood to have recognized in adopting the clear statement rule that it deployed -- for us to be wary of construing Kilbourn in a manner that would deem even such a "quintessentially legislative act," see Pelosi, 5 F.4th at 39, as the decision by the Speaker of the House to follow these rules for the manner of members' participation in floor proceedings (including with respect to the casting of votes) to be beyond the protection of the immunity that has been historically afforded to such an act.

**VII.**

For the reasons given, the District Court's denial of the plaintiffs' motion for a preliminary injunction is **affirmed**.

**-DISSENTING OPINION FOLLOWS-**

---

[21] In that regard, one can also imagine hypothetical suits challenging internal legislative rules regarding core legislative acts brought solely to advantage one side in a partisan battle over a high-stakes legislative procedure (such as one that seeks to augment the requirements that must be met to carry out a filibuster) by, if nothing else, adding costs to the legislative body's adoption of that rule.

**THOMPSON, Circuit Judge, with whom KAYATTA, Circuit Judge, joins, dissenting.** As the COVID-19 pandemic raged to new heights in the winter of 2021, the New Hampshire House of Representatives conducted its sessions in person. Some members of the House have significant personal health issues, which put them at an increased risk of serious illness -- or even death -- if they were to contract COVID-19. Facing the unenviable choice between public duty and death, they sued the Speaker of the House, in his official capacity, for disability discrimination. But the Speaker told the court it would need to bounce the suit altogether without further ado: He says he is entitled to absolute legislative immunity, which shields judicial review of a House rule effectively ousting disabled members from that august assembly and (here's the kicker) leaving their constituents unrepresented.

My colleagues agree with the Speaker's sweeping claim of absolute legislative immunity. I cannot abide by the Court's decision to turn a blind eye to the effective disenfranchisement of thousands of New Hampshire residents simply because their representatives are disabled. But it's not just that. My colleagues also today lay the foundation to immunize any legislative rule that "does not, on its face, target any class of legislators" -- a standard so broad as to immunize race- and

religion-based discrimination, too (examples to follow shortly). The Court's rule opens the floodgates to potential abuse and spells a recipe for disaster in the future.

I respectfully dissent.

**I.**

**A.**

In broad strokes, the common-law doctrine of legislative immunity shields state legislators from liability for their legislative acts. See Supreme Court of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 732 (1980). As we've said before, the aim of legislative immunity is "to shelter individual legislators from the distractions and hindrance of civil litigation and [to] 'immunize[] [them] from suits for either prospective relief or damages.'" Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 630 (1st Cir. 1995) (quoting Consumers Union, 446 U.S. at 731). The immunity is "essentially coterminous" with the Speech or Debate Clause protecting federal legislators. Id. at 629; see Consumers Union, 446 U.S. at 732 (noting state legislators' immunity "is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause").

**1.**

Legislative immunity as well as its federal counterpart in the Speech or Debate Clause finds its roots in pre-colonial

common-law principles. See Tenney v. Brandhove, 341 U.S. 367, 372 (1951). The privilege of parliament "was principally established, in order to protect [its] members not only from being molested by their fellow-subjects, but also more especially from being oppressed by the power of the crown." 1 William Blackstone, Commentaries 159 (1765). It arose in Sixteenth and Seventeenth Century England out of a power struggle between the House of Commons (the lower house of English Parliament) and the King. Id.; see Robert J. Reinstein & Harvey A. Silverglate, Legislative Privilege and the Separation of Powers, 86 Harv. L. Rev. 1113, 1123–35 (1973). During that time, the House of Commons sought an increasingly significant role in legislation. Reinstein & Silverglate, supra, at 1124, 1126–27; J.E. Neale, The Commons' Privilege of Free Speech in Parliament, in Tudor Studies 257, 276 (R. Seton-Watson ed. 1924). Yet Parliamentarians were concerned with receiving the wrath of the crown for opposing the crown's measures, see Neale, supra, at 273–74 -- which, to that point, was not necessarily an unfounded fear, see Reinstein & Silverglate, supra, at 1126–28. Thus, with the English Bill of Rights of 1689, it was codified: "That the freedom of speech, and debates or proceedings in parliament, ought not to be impeached or questioned in any court or place out of parliament." 1 W. & M., 2d sess., c. 2 (1689).

When our Founders made a pre-computer-age copy and paste from the English Bill of Rights to our Constitution in 1789, they had little to say about the Speech or Debate Clause. See Reinstein & Silverglate, supra, at 1136 & nn. 121-24. As some scholars suggest, that's probably so because many Founders took it as a necessary condition of a representative government. Id. For example, Madison saw "the right of self-protection in the discharge of the necessary duties as inherent in legislative bodies." Letter from James Madison to Philip Doddridge (June 6, 1832), in 4 Letters and Other Writings of James Madison 221 (1865). So too did Justice Story. See 2 Joseph Story, Commentaries on the Constitution § 856 (1833) ("It seems absolutely indispensable for the just exercise of the legislative power in every nation, purporting to possess a free constitution of government; and it cannot be surrendered without endangering the public liberties, as well as the private independence of the members.").

From the limited intellections from the founding era, we learn that the Speech or Debate Clause was intended to be for the benefit of the people -- not the representatives. As the Massachusetts Constitution of 1780 noted,[22] legislators' privilege

[22] None other than Samuel and John Adams took the lead in drafting the Commonwealth's constitution. See Nikolas Bowie, The Constitutional Right of Self-Government, 130 Yale L.J. 1652, 1706-07 (2021).

of speech or debate was "so essential to the rights of the people." Mass. Const., pt. 1, art. XXI. According to another founder:

> In order to enable and encourage a representative of the publick to discharge his publick trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence.

James Wilson, Legislative Department, Lectures on Law (1791), reprinted in 2 The Founders' Constitution 331 (Philip B. Kurland & Ralph Lerner eds. 2000).

In discussing the related privilege from arrest,[23] one of our earliest Supreme Court justices explained it necessary because a legislator "has superiour duties to perform in another place. When a representative is withdrawn from his seat by a summons, the people, whom he represents, lose their voice in debate and vote, as they do in his voluntary absence." 2 Story, Commentaries § 857. As Justice Story put it, "[t]he enormous disparity of th[at] evil admits of no comparison." Id.

Legislative privilege was also seen as necessary to the balance of the separation of powers. According to Jefferson and

---

[23] Article I, section 6 also provides that Representatives and Senators "shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same." U.S. Const. art. I, § 6.

Madison, should the privilege of legislators be too weak, the result would be to "give to the Judiciary, and through them to the Executive, a complete preponderance over the legislature rendering ineffectual that wise and cautious distribution of powers made by the constitution between the three branches." Thomas Jefferson & James Madison, Protest to the Virginia House of Delegates (1797), reprinted in 2 The Founders' Constitution 336. But, even insofar as it was necessary for the separation of powers, the true driving goal was the representation of the public: Too much power of the coordinate branches over legislators could allow the branches "to interpose in the legislative department between the constituent and his representative, to control them in the exercise of their functions or duties towards each other," thus "tak[ing] away the substance of representation." Id.

Early American judicial interpretations took a similar tack. The courts thought that legislators "legally and inherently possessed of all such privileges, as are necessary to enable them, with freedom and safety, to execute the great trust reposed in them by the body of the people who elected them." Bolton v. Martin, 1 U.S. (1 Dall.) 296, 303 (C.P. Phila. 1788). The Massachusetts Supreme Judicial Court similarly thought the legislative privileges were "secured, not with the intention of protecting the members against prosecutions for their own benefit,

but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal." Coffin v. Coffin, 4 Mass. 1, 27 (1808). Thus, the courts thought, legislators "ought not to be diverted from the public business by law suits . . . . on account of [their] public business." Bolton, 1 U.S. (1 Dall.) at 305.

All the same, the Founders were well aware that the privilege was subject to abuse. Letter from Madison to Doddridge, supra, at 221. The Founders "well knew how oppressively the power of undefined privileges had been exercised in Great Britain, and were determined no such authority should ever be exercised here." Charles Pinckney, Breach of Privilege, Senate (Mar. 5, 1800), reprinted in 2 The Founders' Constitution 337. Thus, one Founder suggested that the Constitution "never was intended to give Congress, or either branch, any but specified, and those very limited, privileges indeed." Id. Indeed, early courts acknowledged that the people were "careful . . . in providing that the privileges, which they, for their own benefit, had secured to their representatives, should not unreasonably prejudice the rights of private citizens." Coffin, 4 Mass. at 29.

**2.**

Modern courts have placed their own gloss on these historical interpretations, though they echo the same sentiments. The Supreme Court has noted that the immunity's "fundamental purpose [is] freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." Gravel v. United States, 408 U.S. 606, 618 (1972). It "is one manifestation of the 'practical security' for ensuring the independence of the legislature." United States v. Johnson, 383 U.S. 169, 179 (1965). So, legislative immunity "insures that legislators are free to represent the interests of their constituents without fear that they will later be called to task in the courts for that representation." Powell v. McCormack, 395 U.S. 486, 503 (1969).

Modern courts have also recognized that legislative immunity is not a personal privilege. That is, it isn't directed to the benefit of the legislators themselves. See Gravel, 408 U.S. at 617 ("[T]he 'privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government.'"). Rather, it is understood "to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal." Kilbourn v. Thompson,

103 U.S. 168, 203 (1880) (quoting Coffin, 4 Mass. at 27). Thus, "[t]he purpose of the protection . . . is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." Powell, 395 U.S. at 505.

**3.**

Importantly, though, these general principles aren't without exception. The Supreme Court has repeatedly footnoted the possibility that "there may . . . be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." Kilbourn, 103 U.S. at 204; see Gravel, 408 U.S. at 619; Tenney, 341 U.S. at 378-79. Although the Court has never addressed a case in which it has held the extraordinary-character exception to apply, it has clarified that its case law reflects "a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." Gravel, 408 U.S. at 620. That is, the court reads legislative immunity (and the "essentially coterminous" privilege of the Speech or Debate Clause applicable to Congress) "broadly to

effectuate its purposes," Johnson, 383 U.S. at 180, but "not [to] extend beyond what is necessary to preserve the integrity of the legislative process," United States v. Brewster, 408 U.S. 501, 517 (1972).

As examples of potentially extraordinary legislative acts, the Supreme Court has hypothesized a legislature that "execut[es] . . . the Chief Magistrate of the nation, or . . . assum[es] the function of a court for capital punishment." Kilbourn, 103 U.S. at 204-05. We have similarly pondered a legislature that "votes to allow access to its chambers to members of only one race or to adherents of only one religion," suggesting these might veer into the orbit of the extraordinary-character exception. Harwood, 69 F.3d at 634. These circumstances, we and the Court have said, could be so far afield from the purpose of legislative immunity that the otherwise legislative acts might not engender absolute immunity.

**B.**

When we think about this case against the backdrop of the historic origins of legislative immunity, it becomes clear that applying legislative immunity here fits neatly into that category of legislative actions of an extraordinary character.

**1.**

Foreclosing judicial review based on the facts of this case conflicts directly with the purpose of legislative immunity. If legislative immunity is meant to "enable and encourage a representative of the publick to discharge his publick trust with firmness and success," Wilson, supra, at 331, then it seems contradictory that the immunity would protect some legislators' decision to effectively preclude other legislators from discharging their duties. Indeed, one of our earliest Supreme Court justices recognized that the related immunity of legislators from arrest was undergirded by the worry that "[w]hen a representative is withdrawn from his seat by a summons, the people, whom he represents, lose their voice in debate and vote, as they do in his voluntary absence." 2 Story, Commentaries § 857. Yet the challenged action here, too, leaves some people without their voice in the representative government.

If legislative immunity is truly a protection offered by the people for their own benefit, see Mass. Const., pt. 1, art. XXI (noting the privilege was "so essential to the rights of the people"); Coffin, 4 Mass. at 27 (noting the privileges were "secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people"); Jefferson & Madison, supra, at 336 (reasoning that

the purpose of the privileges is to protect the relationship "between the constituent and his representative"), then what benefit would the people gain in immunizing their own disenfranchisement? Indeed, the Founding generation recognized that the people were "careful . . . in providing that the privileges, which they, for their own benefit, had secured to their representatives, should not unreasonably prejudice the rights of private citizens." Coffin, 4 Mass. at 29. I cannot imagine why the effective ouster and disenfranchisement of some should be immunized in favor of the representative interests of others. Indeed, as Justice Story long ago recognized, the removal of a representative from her official duties in the face of an arrest, process, or subpoena, and the resulting loss of a voice for those she represents, is an "evil [that] admits of no comparison." 2 Story, Commentaries § 857.

**2.**

Nor has the Supreme Court suggested that legislative immunity would attach in circumstances like those in this case. Indeed, the Court has never addressed any case in which a legislature has sought to exclude legislators based on federal statutorily protected characteristics.

The closest the Court has come to the circumstances we face here is Powell, where the Court faced a challenge to a U.S.

House of Representatives resolution excluding a duly elected member from being seated. 395 U.S. at 492-93. The resolution -- which excluded, not expelled the Congressman, see U.S. Const., art. I, § 5; Powell, 395 U.S. at 506-07 -- punished the Congressman for his actions in a civil suit, his wrongful use of House funds for personal gain, and lies on House expenditure reports, Powell, 395 U.S. at 493.[24] It was enacted by a more than two-thirds majority of the House. Id. at 500. And it was enforced by the House Clerk, the Sergeant at Arms, and the Doorkeeper, who respectively refused to perform service for the Congressman, pay him his salary, and threatened to deny him admission to the House chamber. Id. at 500-01.

The Court concluded that the Speech or Debate Clause barred the suit against the legislative defendants, but it did not bar suit against the Clerk, Sergeant at Arms, or the Doorkeeper. Id. at 506. The Court reasoned that, by allowing the suit to proceed against the House employees, it left the House members "fully protected" by the Speech or Debate Clause, since they were "relieved of the burden of defending themselves." Id. at 505.

[24] I also note that Powell involved a resolution that excluded a member, in essence, for cause. See id. at 492. Here, though, the legislative act effectively ousting the representatives has only one cause: their statutorily protected disabilities. Which is a far cry from exclusion of a member for nefarious activities that scathed the public trust in the office.

Yet the Court made clear what it did not decide: "whether under the Speech or Debate Clause petitioners would be entitled to maintain this action solely against members of Congress where no agents participated in the challenged action and no other remedy was available." Id. at 506 n.26.

That reservation is again revealing of the disconnect between the application of legislative immunity here and its purpose. The Powell Court did not explain why absolute legislative immunity might bend to a suit against legislators where no employees were involved, see id., but I think the reasoning seems quite clear. The Court must have identified something truly peculiar about the facts in Powell. And indeed the allegations were peculiar. They were not of a private party or the executive trying to distract legislators from their duties or punish them for their votes. Rather, it was a suit by a legislator against his legislative peers who had excluded him from carrying out his own legislative responsibilities towards his constituents -- just as it is here.

My colleagues also note that Bond v. Floyd, 385 U.S. 116 (1966), addressed a similar challenge to a state legislature's exclusion of a member, yet the Court (for some unknown reason, my colleagues suggest) did not address legislative immunity. But the Court didn't reach any immunity because the State conceded "that

it should [not] be completely free of judicial review whenever it disqualifies an elected Representative." Id. at 130. Rather, the State "admit[ted] that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards." Id. And rightfully so -- the consequences of not conceding at least some level of judicial review to the exclusion of a duly elected representative are staggering, as the Powell Court implicitly recognized. See 395 U.S. at 506 n.26. It would permit legislative immunity, designed to safeguard representative democracy, to be weaponized against the representation it is meant to support.[25]

**3.**

Even though the grant of legislative immunity here hardly squares up with the immunity's purpose, the majority still

[25] My colleagues cite to Rash-Aldridge v. Ramirez, 96 F.3d 117, 119 (5th Cir. 1996), to argue that legislative immunity can apply to an ouster of an elected official notwithstanding Bond. Yet Rash-Aldridge involved the removal of an elected official from a seat on a separate planning board to which she was appointed by the elected city council (of which she was also a member). Id. at 118-19. It did not involve -- as in Bond and here -- an attempt to oust the official from her elected position. Id. at 119 ("Her capacity as an elected official was not compromised because the council did not try to remove her from her seat on the council nor take away any privileges of that office because of what she said or did."). The court instead likened it to the choice to fire a public employee. Id. at 119-20.

thinks this is not a sufficiently "extraordinary" circumstance for the immunity to reach its limit. According to my colleagues, discrimination on the basis of a disability -- in contravention of a landmark federal statute -- is inconsequential.

Congress, though, would certainly disagree. Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). (Full stop.) It comes in response to Congress's finding that "many people with physical or mental disabilities have been precluded from [participating in all aspects of society] because of discrimination," id. § 12101(a)(1), and that those with disabilities, "as a group, occupy an inferior status in our society," id. § 12101(a)(6). Specifically, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of . . . overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." Id. § 12101(a)(5). To remedy that wrong, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132.

That still isn't enough for my colleagues, though. They say that legislative rules subverting the ADA and discriminating against the disabled are somehow not "extraordinary" enough. Even though Congress explicitly found that people with disabilities were systematically discriminated against and enacted a law meant to put those individuals on equal footing. Even though Congress thinks that discrimination is a "serious and pervasive social problem." Id. § 12101(a)(2). And even though Congress passed the ADA with a seeming intent to reject the Supreme Court's refusal to consider disabilities a suspect classification akin to race. See Anita Silvers & Michael Ashley Stein, Disability, Equal Protection, and the Supreme Court: Standing at the Crossroads of Progressive and Retrogressive Logic in Constitutional Classification, 35 U. Mich. J.L. Reform 81, 111-15 (2002); see also 42 U.S.C. § 12101(a)(7) (2007) (describing the disabled as a "discrete and insular minority").[26]

---

[26] Though the 2008 amendments to the ADA removed the "discrete and insular" finding, the House Report reflects the amendment was not to discount the prior finding, but to correct misimpressions that the ADA was meant to have narrow applicability. See H.R. Rep. No. 110-730, pt. 2, at 8 (2008) (noting that Congress still believes that "individuals with disabilities 'have been faced with

Moreover, even taking the majority at its conclusion on this piece (even though it's flat-out wrong), there's one whopping interest the majority entirely ignores here: The interests of representative government. And as I've already detailed, we and the Supreme Court have repeatedly expressed a skeptical eye toward applying legislative immunity to legislative actions that effectively remove certain constituents' representative power in the government. See Powell, 395 U.S. at 506 n.26; Harwood, 69 F.3d at 634.

**4.**

Given those weighty interests at stake, one would expect a significant explanation for the extraordinary decision to exclude some duly elected representatives from their representative duties. Unfortunately, disappointment awaits: The Speaker does not submit particularly compelling countervailing reasons that representative government is furthered by the rule here. Rather, even a bare review of the Speaker's proffered reasons only further reveals the extraordinary nature of the rule's effect here.

---

restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals'").

At first, there were concerns in New Hampshire that a remotely held session of the legislature could face constitutional complications. But, in November 2020, the New Hampshire Supreme Court made clear that no such issues existed. Op. of the Justs., 247 A.3d 831, 840 (N.H. 2020).

So, since then, the House has claimed logistical issues in having remote sessions. According to the Clerk of the House, he lacks enough staff with the technological savvy or bandwidth to manage "monitor[ing] remote technology" to "record votes during the session." The Clerk also claims there are "substantial concerns that recording the votes remotely would be problematic," since the clicker used to record votes cannot be used offsite. He speculated about the potential that votes are not appropriately counted, or that some technological issue might result in improper vote counting. Yet, in the in-person sessions the House held back in 2020, the House had technical issues with voting, including some that resulted in multiple instances of vote-count errors.

As another reason against permitting remote participation, the Speaker apparently still claims (nearly eighteen months into the pandemic) that he has yet to figure out the technical logistics of remote participation. But he has not detailed any efforts made toward doing so. And, in February 2021 (nearly three months after constitutional concerns were answered),

the Clerk of the House testified that he hadn't seen any communications detailing attempts to work with a vendor to get remote participation up and running. What is clear is that the Speaker's IT woes could be cured with an appropriate contract.

The Speaker also claims this rule is integral to ensuring that the body conducts its business "in the public view, so citizens may observe the proceedings, including debate, amendment, and voting, and the environment in which legislators operate." Remote participation, the Speaker contends, "diminishes the public's ability to observe these individuals to ensure, for example, that their votes are not being inappropriately influenced by persons off-screen." Yet House committee hearings have included remote participation, even though the same concerns would seemingly apply there.

These criticisms are not meant to question that there may be legitimate reasons not to permit elective remote participation. They merely highlight the fact that there is no grave legislative concern pushing the opposite scale here for those representatives who claim to be forced, due to their disabilities, to choose between fulfilling their duties and a significant risk of death. And, it goes to show the truly extraordinary character of the legislative action here: effective ouster of some duly elected representatives based on selective reasoning.

## II.

Still, the Court's brush-off of disability-based discrimination and resulting disenfranchisement is not the only flaw in the analysis. Perhaps even more troubling than my colleagues' ultimate conclusion is how they get there. I see at least four infirmities, which I'll explain in turn.

### A.

The first three fall into a general bucket of ways in which the majority tries to discolor the arguments made by the plaintiffs.

First, the majority hamstrings the extraordinary-character argument by insinuating it is waived, but just without saying so. Starting the discussion by noting that this argument was supposedly "barely developed in the District Court or before the panel," ante at 54, my colleagues lead off an attempt to make short shrift of this significant argument. Yet, they avoid saying that the plaintiffs in fact waived the argument. And rightfully so given that the plaintiffs took up three pages of their opening brief to the panel on this issue, and because we've entertained in the past arguments less developed than the one here.

Second, the majority also tries to bruise the argument by emphasizing that this case arises from a request for "emergency relief." Yet it points to no authority on why the extraordinary

relief of a preliminary injunction should be relevant to the purely legal question of whether the plaintiffs are likely to succeed (as the majority acknowledges, see ante at 17-18). Indeed, the equitable-balancing parts of the preliminary-injunction analysis are not at issue here. And, in any event, it was the Speaker who raised legislative immunity as a full bar not just to the preliminary injunction, but, effectively in turn, the action as a whole.

And third, in an effort to throw the reader off the trail of the extraordinary-character exception, the majority picks and chooses the relevant examples of extraordinary-character hypotheticals laid out by courts. It focuses in on the most egregious examples from Kilbourn: a legislature that "executu[es] . . . the Chief Magistrate of the nation, or . . . assum[es] the function of a court for capital punishment." 103 U.S. at 204-05. True, those examples of a legislature on a murderous tear pale to a certain extent in comparison to the issues here. (Though it is important to note that the plaintiffs here alleged they were forced to choose between death and fulfilling their duty as an elected legislator. So it's not that far afield from Kilbourn's examples.) But the majority noticeably neglects to mention that a panel of this court suggested that a "legislature that votes to allow access to its chambers to members of only one race or to adherents of one

religion" might veer into the orbit of the extraordinary-character exception. Harwood, 69 F.3d at 634. Curiously so given how that hypothetical rings awfully close to what the plaintiffs claim here.

**B.**

The most menacing problem with the analysis is how my colleagues shrug off the impact of this ruling on later cases. Rest assured, my colleagues claim, we need not concern ourselves with the horrifying hypotheticals heralded by the plaintiffs as the next discriminatory legislative rules because they are not this case. See ante at 57-58. They say we can cross that bridge another day because this decision is limited to no more than the facts of this case.

Poke at those assurances a little, however, and they dissipate into thin air. Rather, when we line up our so-called parade of horribles, it becomes clear that the majority's rule -- immunizing conduct that "does not, on its face, target any class of legislators," ante at 56 -- will give no room for subsequent panels of this Court to address those hypotheticals. The Court instead opens the floodgates to a host of rules that are designed to oust various subsets of legislators based on a host of protected characteristics, just so long as the other legislators are clever enough to craft them in an ostensibly neutral way.

**1.**

Take, for example, the following legislative rules governing the voting process:

- A rule that all members must stand to address the legislative body, but one of the members is wheelchair bound;
- A rule prohibiting the use of any electronic devices on the voting floor, but a member needs a hearing aid;
- A rule prohibiting service animals from entering the floor during a session, but a member requires one;
- A rule prohibiting a sign-language interpreter from entering the floor during a session of the body, but a member requires an interpreter.

All are facially neutral but would effectively bar select representatives from fulfilling their representative duties. So, my colleagues say, absolute legislative immunity would apply. Tough luck for any representative (or her constituent) who thought, like Congress, that a wheelchair shouldn't limit the right to serve as an elected representative.

And those are just some of the hypotheticals related to disabilities. Take a few more for-examples:

- A rule prohibiting a representative from wearing any headwear,[27] but certain members adhere to a religion that requires doing so[28];
- A rule prohibiting facial hair, but certain members' religions prohibit them from shaving[29];

---

[27] Rules of legislative procedure requiring particular clothing are not all that uncommon, even though my colleagues claim I have lined up a string of "hypotheticals concerning never-undertaken legislative acts." Ante at 58. Starting in 1837, the U.S. House of Representatives had a blanket rule banning members from wearing headwear in the chamber. Cong. Globe, 25th Cong., 1st Sess. 31 (1837); see Rules of the House of Representatives, 115th Cong., Rule XVII, cl. 5 (2017). It wasn't until 2019 that an exception was made for religious headwear. H.R. Res. 6, 116th Cong., § 102(x) (2019).

The New Zealand Parliament also faced controversy when it booted a member who hailed from one of New Zealand's Indigenous cultures for failing to wear a European-style necktie and instead donning a traditional pendant. See Natasha Frost, He Calls the Tie a 'Colonial Noose.' Now Parliament Says It's No Longer Mandatory, N.Y. Times (Feb. 10, 2021), https://www.nytimes.com/2021/02/10/world/asia/new-zealand-rawiri-waititi-tie.html.

[28] Again, not an uncommon practice. For example, many observant Jewish men wear a yarmulke or kippah. See The Pluralism Project at Harvard University, Kippah (2022), https://pluralism.org/kippah. As a matter of religious practice, Sikh men wear turbans, and Sikh women wear long head scarfs called a chunni. See The Pluralism Project at Harvard University, The Five K's at 1 (2020), https://pluralism.org/files/pluralism/files/the_five_ks.pdf. Many Muslim women wear a hijab, another type of religious head covering. See The Pluralism Project at Harvard University, Women in Islam at 1, 3 (2020), https://pluralism.org/files/pluralism/files/women_in_islam.pdf.

[29] These would include, for example, adherents of Ultra-Orthodox or Hasidic Judaism, certain denominations of Islam, Sikhism, or Rastafarianism. See Dawinder S. Sidhu, Religious Freedom and Inmate Grooming Standards, 66 U. Miami L. Rev. 923, 939 (2012) (collecting sources).

- A rule requiring that all sessions be held on Saturday mornings, but some members are Jewish and observe Shabbat.[30]

According to the majority, since all of these rules "on [their] face[] do[] not take aim at any class of legislators," then absolute legislative immunity would apply. Another bad break for those who thought that there was no religious litmus test for serving as a representative. Especially tough considering that, in Harwood, we specifically noted (and forgive me for repeating this but it's important) that "a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion" might just rise to the level of the extraordinary-character exception. 69 F.3d at 634. My colleagues, of course, provide no explanation of how we square that up.

Instead, my colleagues caveat that this is a case addressing "a decision to follow -- rather than depart from -- existing House rules . . . ." Ante at 56. There's no discrimination to worry about here, they assure us, because this case "involves adhering to existing rules rather than making new

[30] In case the reader is unfamiliar, some followers of Judaism "keep Shabbat" and must refrain from any labor from sunset Friday to sunset Saturday. See The Pluralism Project at Harvard University, Keeping Shabbat at 1 (2020), https://pluralism.org/files/pluralism/files/keeping_shabbat.pdf.

ones." Id. As with their other consolations, this one, too, rings hollow. My colleagues fail to explain why we should turn a blind eye to discrimination simply because it is based on an established practice within a legislative chamber. They also offer no principled reason why the House's choice to continue to adhere to a pre-existing rule -- in the face of claims that this rule discriminates against the disabled -- somehow lessens the potential for nefarious intent compared to a choice to enact a new rule.

Nor does their distinction alleviate the harm identified by many of these hypotheticals. For one example, as I noted, the U.S. House of Representatives banned headwear in the chamber from 1837 to 2019. And it didn't lift that rule until the first two Muslim-American women were elected to that chamber, and one of them wears a religious headscarf.[31] Had a majority of the U.S. House members in January 2019 chosen to simply adopt the old rules without change, then, according to the majority, that representative and her thousands of constituents would be out of luck and barred from the federal courts. The same goes for any

---

[31] Michelle Boorstein, Rep. Ilhan Omar Prompts New Rule That Allows, for the First Time in 181 Years, Head Coverings on House Floor, Wash. Post. (Jan. 4, 2019), https://www.washingtonpost.com/religion/2019/01/04/rep-ilhan-omar-prompts-new-rule-that-allows-first-time-years-head-coverings-house-floor/.

newly elected wheelchair-bound representative to the House in New Hampshire and her constituents: The current House Rules require that a member must "rise from his or her seat" to "speak in debate, make a motion, or deliver any matter to the House." 2021-2022 Rules of N.H. House of Representatives, R. 11. As I've detailed, immunizing these effective ousters flies in the face of the purpose of legislative immunity.

Tellingly, the Speaker has no response to these hypotheticals that are not so far afield. Indeed, at oral argument, the Speaker clarified that challenges to the hearing-aid and service-animal hypotheticals would be barred by absolute legislative immunity. And the majority apparently agrees, as its telling offers no wiggle room for facially neutral rules governing legislative procedure that are mere backhanded efforts at discriminatory ousters.

Recognizing the shocking impact of his rule but of course trying to deflect, the Speaker contends that these hypothetical rules may not be integral to the legislative process in that they affect the way that legislators speak, debate, and vote, and thus do not gain absolute immunity. Yet it takes no Walt Disney-level imagination to conjure up random reasons a legislature might provide that would attach the hypothetical rules to the so-called integral aspects of the legislative process. A legislature could

ban all electronic devices for security purposes, or because they tend to interfere with the vote-counting system. It could ban service animals because they supposedly distract from the legislative process. It could ban all non-legislators including sign-language interpreters from the floor for the same reasons offered in Harwood. It could ban headwear or facial hair out of some belief that it is necessary for decorum or security (e.g., hidden weapons).[32] And, following on from the Speaker's contentions about public access here, it could hold legislative sessions only on Saturday mornings because it has concluded that is the time most accessible to the public.

Again, the majority tell us to fear not. For in its telling, when these cases come along, we can be "sensitive to context." Ante at 57. Yet that consolation, too, falls apart when meshed with other Supreme Court precedent on legislative immunity. As the Court has said, "[t]he claim of an unworthy purpose does not destroy the [legislative] privilege." Tenney, 367 U.S. at 377; see also Bogan v. Scott-Harris, 523 U.S. 44, 54–55 (1998). According to the Supremes "it [is] not consonant with our scheme of government for a court to inquire into the motives

[32] See 10 Reg. Deb. 2163 (1833) (statement of Rep. Patton) (calling the practice of wearing hats in the House chamber "indecorous").

of legislators." Tenney, 367 U.S. at 377; see also Johnson, 383 U.S. at 184–85 (holding a criminal prosecution for bribery could not inquire into a legislator's motive for legislative action under the Speech or Debate Clause). So, again, the majority's rule may appear a simple solution to this case. But it may well doom the next case where there is some suspicion of a facially neutral rule driven by "abuse." See ante at 57. When we turn to that case, lo and behold, we might be forbidden to inquire into the motives of the particular legislative action. See Bogan, 523 U.S. at 54–55; Tenney, 367 U.S. at 377. So in practice, the majority's rule here likely means that legislative immunity is sacrosanct and will bar any suit based on any facially neutral legislative rule, regardless of its impact on our representative democracy.

**2.**

Attempting still to distance this case from its clear implications, the majority casts blame on the plaintiffs for suing a legislator directly as opposed to a non-legislator employee within the House, such as a doorkeeper.[33] See ante at 56. My

[33] My colleagues' suggestion that the extraordinary-character exception should not apply here because this is a suit against a legislator (and not an employee) is more smoke and mirrors. Indeed, the Supreme Court's hypotheticals in Kilbourn, as well as our hypotheticals in Harwood, would also probably leave someone else to sue. But the point is that a legislator does not enjoy legislative immunity when the action at issue is of an extraordinary character. See Kilbourn, 103 U.S. at 204 (noting

colleagues suggest that the plaintiffs' suit could have proceeded against a doorkeeper without facing the bar of legislative immunity. See id. (citing Powell, 395 U.S. at 504-06). But the Powell Court, as I've already noted, explicitly carved out the possibility of whether the plaintiffs there "would be entitled to maintain this action solely against members of Congress where no agents participated in the challenged action and no other remedy was available." Id. at 506 n.26. And in Powell, the plaintiff could sue the Clerk, Sergeant at Arms, and Doorkeeper because they each took action to enforce the rule directly against the Congressman. See id. at 504. Here, though, who should the plaintiffs have sued instead? When asked at oral argument, the Speaker said there is no one else to sue -- this is "a self-executing rule." And my colleagues, similarly, have no answer. Instead, they take Powell for its support but toss away its limitation.

My colleagues also fail to recognize the bind their rule puts would-be plaintiffs in when combined with our prior precedent. Suggesting that the plaintiffs should have sued a House employee

---

that there may be actions "of an extraordinary character, for which the members who take part in the act may be held legally responsible" (emphasis added)). The extraordinary-character exception applies (as its name suggests) as an exception to the typical rule that legislative immunity would bar suit.

instead, they nonetheless ignore the fact that we held in Harwood that the doorkeeper sued there could also claim legislative immunity since he "did nothing more or less than to interpret and enforce" the legislative rule at issue. 69 F.3d at 631; see id. at 635 (holding that all defendants could assert the immunity); id. at 641-43 (Lynch, J., dissenting) (critiquing the majority's conclusion that the doorkeeper could assert legislative immunity). So, under this Court's precedent, plaintiffs can sue neither the legislator nor the non-legislator enforcer of a rule.[34] Which further underscores the immense scope of the immunity the majority's rule sets up here.

* * *

The problem with the majority's telling here is that it has no limiting principle at all. Instead, it gives carte blanche to legislatures to strategically silence legislative opponents -- and effectively disenfranchise their constituents -- so long as they can conjure up some facially neutral rationale for the rule. I cannot concur in giving such wide latitude at the expense not only of other legislators (and solely on the basis of their

[34] That is so notwithstanding pre-Harwood Supreme Court precedent seemingly to the contrary. See, e.g., Markham Concepts, Inc. v. Hasbro, Inc., 1 F.4th 74, 83 (1st Cir. 2021) (noting that arguments that a panel "misconstrued then-existing Supreme Court precedent" generally won't fly as an exception to the law-of-the-circuit rule).

federally protected disabilities), but also at the expense of their constituents' voices in the legislative process. I agree with Justice Story that "[t]he enormous disparity of th[at] evil" -- of forcing the absence of duly elected representatives from their solemn duties -- "admits of no comparison." 2 Story, Commentaries § 857. But forcing out duly elected New Hampshire representatives with disabilities is exactly the evil that has befallen here. I therefore respectfully dissent.